IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

RHONDA SUE CYRUS,

      Plaintiff,

v.                             **Case No.: 3:19-cv-00258**

ANDREW M. SAUL,
Commissioner of the
Social Security Administration,

      Defendant.

**PROPOSED FINDINGS AND RECOMMENDATIONS**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending are Plaintiff's Motion for Judgment on the Pleadings and Brief in Support, and the Commissioner's Brief in Support of Defendant's Decision, requesting judgment in his favor. (ECF Nos. 15, 16, 19).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's

request for judgment on the pleadings be **DENIED**; the Commissioner's request for judgment on the pleadings be **GRANTED**; the Commissioner's decision be **AFFIRMED**; and this case be **DISMISSED** and removed from the docket of the Court.

## I.    Procedural History

On September 14, 2015, Rhonda Sue Cyrus ("Claimant"), completed applications for DIB and SSI, alleging a disability onset date of January 1, 2000 due to degenerative disc disease, severe right shoulder pain from a fracture, asthma, fatigue, hand pain, hip and back pain, major depression, obsessive compulsive disorder, panic attacks, and piriformis syndrome on the left side. (Tr. at 239-46, 257). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 12). Claimant then filed a request for an administrative hearing, which was held on December 15, 2017 before the Honorable Laura Bernasconi, Administrative Law Judge. (Tr. at 30-58). By written decision dated April 18, 2018, the ALJ found that Claimant was not disabled as defined by the Social Security Act. (Tr. at 9-29). The ALJ's decision became the final decision of the Commissioner on February 8, 2019 when the Appeals Council denied Claimant's request for review. (Tr. 1-5).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 6, 7). Claimant filed a Motion for Judgment on the Pleadings and Brief in Support, and the Commissioner filed a Brief in Support of Defendant's Decision. (ECF Nos. 15, 16, 19). Consequently, the matter is fully briefed and ready for resolution.

2

## II.    Claimant's Background

Claimant was 36 years old on her alleged onset date and 54 years old on the date of the ALJ's decision. She completed high school and previously worked as a licensed practical nurse (LPN) and a telemarketer. (Tr. at 258-59).

## III.    Summary of ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary, and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

3

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation

resulting from the impairment according to criteria specified in 20 C.F.R. §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the four functional areas of understanding, remembering, or applying information; (2) interacting with others; (3) maintaining concentration, persistence, or pace; and (4) adapting or managing oneself will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental functional capacity. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). The regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2000. (Tr. at 14,

5

Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since January 1, 2000, the alleged disability onset date. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: obesity, degenerative disc disease (DDD) with hip pain, status post right shoulder injury with residual hand and arm pain, asthma, chronic obstructive pulmonary disease (COPD), depression, and anxiety. (Tr. at 14-15, Finding No. 3). The ALJ considered Claimant's prior cervical cancer, alcohol abuse, and hysterectomy, as well as her bladder issues with incontinence, but found these impairments to be non-severe. (Tr. at 15).

Under the third inquiry, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 15-19, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can frequently climb ramps and stairs and never climb ladders, ropes, or scaffolds. She can frequently balance, stoop, crouch, and crawl. She can use the right upper extremity for occasional overhead reaching. She should avoid concentrated exposure to temperature extremes, wetness, humidity, vibration, fumes, odors, dusts, gases, and poor ventilation. She should avoid concentrated exposure to hazards such as machinery and unprotected heights. She can perform simple repetitive work.

(Tr. at 19-22, Finding No. 5). At the fourth step, the ALJ determined that Claimant could not perform her past relevant work. (Tr. at 22, Finding No. 6). Therefore, the ALJ reviewed Claimant's past work experience, age, and education in combination with Claimant's RFC to determine her ability to engage in other substantial gainful activity. (Tr. at 23-24, Finding Nos. 7 through 10). The ALJ considered that (1) Claimant was born in 1963 and was defined as an individual closely approaching

6

advanced age on the alleged disability onset date;[1] (2) Claimant had at least a high school education and could communicate in English; and (3) transferability of job skills was not an issue because the Medical-Vocational Rules supported a finding that Claimant was "not disabled," regardless of Claimant's transferable job skills. (Tr. at 23, Finding Nos. 7 through 9). Taking into account these factors, Claimant's RFC, and the testimony of a vocational expert ("VE"), the ALJ determined that Claimant could perform other jobs that existed in significant numbers in the national economy, including light-level work as a cashier, sorter, or non-postal mail clerk. (Tr. at 23-24, Finding No. 10). Consequently, the ALJ concluded that Claimant was not disabled as defined by the Social Security Act and was not entitled to benefits. (Tr. at 24, Finding No. 11).

## IV.  **Claimant's Challenges to the Commissioner's Decision**

Claimant asserts two discernable challenges to the Commissioner's decision. First, Claimant argues that the ALJ should have assessed additional RFC restrictions; including, that Claimant could only occasionally interact with the public due to anxiety, occasionally reach in front due to her right shoulder impairment, would be off-task 10 percent of the workday due to incontinence, and would need to change positions between sitting and standing every 15 minutes due to her musculoskeletal issues. (ECF No. 16 at 4-5, 7-8). She contends that such limitations are supported by her own testimony and her consultative examination. (*Id.* at 4-5). In her second challenge to the Commissioner's decision, Claimant argues that the ALJ should have accepted the

---

[1] The regulations, in fact, define individuals under the age of 50 as "younger" persons. 20 C.F.R. §§ 404.1563, 416.963. However, this error in the ALJ's written decision had no bearing on the ultimate determination of non-disability. If any, the error could have only weighed in Claimant's favor because the occupational base, or number of available jobs, erodes as claimants advance age categories, and thus the likelihood of a disability finding increases.

VE's testimony that there would be very few jobs or no jobs that a person with the foregoing restrictions could perform, and, thus, the ALJ should have concluded that Claimant was disabled at step five of the sequential evaluation. (*Id*. at 10-11).

In response to Claimant's challenges, the Commissioner argues that substantial evidence supports the ALJ's RFC finding. (ECF No. 19 at 5-9). As such, the Commissioner argues that there was no basis for the ALJ to accept the VE's testimony regarding alternative hypotheticals that included additional limitations. (*Id*. at 9).

**V.    Relevant Evidence**

The undersigned has reviewed all of the evidence before the Court. The information that is most pertinent to Claimant's challenges is summarized as follows:

### *A. Treatment Records*

On September 21, 2007, Claimant presented to Prestera Center for a psychiatric intake evaluation. Claimant reported symptoms of depression and anxiety. She related that she was married four times, and all four of the relationships were abusive. (Tr. at 483). Claimant left her husband and was living with her mother and adult sons. (*Id*.). During the evaluation, Claimant was calm, cooperative, coherent, and fully oriented. (*Id*.). The certified physician assistant diagnosed Claimant with major depressive disorder and prescribed Cymbalta and Vistaril. (Tr. at 484).

On February 9, 2013, an x-ray was taken of Claimant's lumbosacral spine due to reported back pain. Her vertebral body heights were maintained, there was no instability on flexion or extension, and there was no significant disc space narrowing. (Tr. at 390).

Claimant presented as a new patient to primary care physician, Cari Burck, D.O., the following year, on January 17, 2014, relating that she experienced back pain

for years, and also suffered hip pain for the past two months. (Tr. at 428). Dr. Burck prescribed Mobic and ordered another lumbar spine x-ray. (*Id*.). However, Claimant's prescription was switched to another non-steroidal anti-inflammatory drug (NSAID), naproxen, due to Claimant's allergic reaction to Mobic. (Tr. at 453). Claimant's repeat lumbar spine x-ray was taken on January 28, 2014. Claimant had minor osteophyte formation in her lumbar spine with relative preservation of the disc spaces. (Tr. at 393). The conclusion was that Claimant had mild degenerative disc disease. (*Id*.). A few days later, on January 31, 2014, Claimant told Dr. Burck that her hip pain resolved with naproxen. (Tr. at 426). Dr. Burck renewed Claimant's prescription for naproxen and referred her to physical therapy for degenerative disc disease of the lumbar spine. (*Id*.).

On February 11, 2014, Claimant presented to physical therapist, Rob Crowder. In advising P.T. Crowder of her medical history, Claimant reported several prior injuries, including a back injury when lifting a patient as a nurse's aide in 1993, a motor vehicle accident in 2007 after which she fell while getting out of her car, and two falls down the attic steps two years earlier, which injured her lower back. (Tr. at 397). Claimant stated that her pain was concentrated in her lumbosacral spine, particularly on the left side, but it no longer radiated into her legs since she started taking naproxen. (*Id*.). Claimant affirmed that she was doing better overall, but claimed that she still had constant pain. (*Id*.). She rated her pain as three on a 10-point scale. (*Id*.). On examination, Claimant had some reduction in her lumbar range of motion and poor trunk strength, but she ambulated well without deviation and with equal weight bearing bilaterally; she could heel walk, toe walk, and squat without difficulty; and her straight leg raising tests were negative. (*Id*.). P.T. Crowder assessed that Claimant had good tolerance to initial evaluation treatment. (*Id*.).

9

On April 14, 2014, Claimant advised Dr. Burck that her back was "a little better" and she no longer had radicular pain in her leg. (Tr. at 424). Claimant related that she was doing physical therapy at home because she had difficulty getting rides to appointments. (*Id*.). Claimant stated that her "nerves" were "bad." (*Id*.). Dr. Burck prescribed Prozac for anxiety, renewed Claimant's prescription for naproxen, and instructed Claimant to continue her physical therapy exercises at home twice per day. (Tr. at 425).

On May 31, 2014, Claimant presented to the emergency department at St. Mary's Medical Center with a laceration on her left elbow. (Tr. at 339). Claimant reported that an attic staircase fell on her when she was pulling it down, and the metal siding on the stairs lacerated her arm. (*Id*.). Her only other complaint at the time was tenderness in her right shoulder. (*Id*.). X-rays of Claimant's right shoulder and elbow were negative for any issues. (Tr. at 343-44). There was a prominent soft tissue defect along the ventral aspect of Claimant's left elbow, but no fracture, dislocation, joint effusion, or foreign body. (Tr. at 345). It was believed at that time that there was no injury to Claimant's right shoulder.

Claimant followed up with Dr. Burck on August 15, 2014. She complained of myalgia and arthralgia, but she denied any genitourinary complaints or psychiatric issues. (Tr. at 371). She was pleasant, well groomed, alert, and oriented, and she maintained good eye contact. (*Id*.). Her muscle strength and tone were equal bilaterally in all extremities and she ambulated well. (Tr. at 372). She had full range of motion in her right shoulder, but she complained of pain in the anterior aspect of her shoulder. (*Id*.). Dr. Burck referred Claimant for a shoulder MRI. (*Id*.).

The MRI of Claimant's right shoulder, taken on September 25, 2014, revealed a

healing non-displaced greater tuberosity fracture without rotator cuff damage. (Tr. at 357, 389). Claimant was referred to the Fracture Clinic at Marshall Health where she was examined by Katherine Wingate, C-NP, on October 9, 2014. Nurse Wingate explained to Claimant that her fracture was healing, but her residual pain was likely due to stiffness. (Tr. at 357). Nurse Wingate emphasized that physical therapy was critical to alleviate the painful stiffness. (*Id.*). Nurse Wingate explained that, although physical therapy could be uncomfortable at times, if Claimant's condition remained untreated, it could result in true adhesive capsulitis, which would require much more significant intervention. (*Id.*).

Claimant followed up with Nurse Wingate on November 13, 2014. She had not participated in physical therapy. (Tr. at 354). Nurse Wingate again expressed to Claimant that, if she refused to participate in physical therapy, she risked "going into frozen shoulder." (*Id.*). She gave Claimant a steroid injection in her shoulder and again ordered physical therapy treatment. (*Id.*).

On July 2, 2015, Claimant presented to Dr. Burck. Claimant stated, "the past year has been horrible," and she related a litany of complaints, including pain and loss of use of her arm, back pain, grinding in her left hip, and urinary incontinence. (Tr. at 359). Claimant reported that her back pain was in her mid-back and below, she could barely stand due to the pain, and was "in agony all of the time." (*Id.*). Claimant said that every day since she fell, she had no quality of life. (*Id.*). In terms of urinary incontinence, she described a sense of urgency and indicated that she urinated when she coughed or sneezed as if her muscles did not "seem to work anymore," but she did not have any pain related to the issue. (*Id.*). Claimant stated that she would not go to physical therapy because she would not go in public. She also complained that the

injection in her shoulder only lasted five minutes. She was displeased with her care at Marshall Health and discontinued treatment. (*Id*.). She said naproxen was not helpful for her pain, and her nerves were shattered. (*Id*.). Claimant related that she had anxiety since childhood and she was taking Prozac, which helped her a lot, although she still had panic attacks. (*Id*.).

On examination, Claimant's gait was stiff and antalgic, and her right upper arm was inflamed and painful to palpation with limited range of motion in her shoulder due to pain. (Tr. at 361). She had some limited range of motion and tenderness to palpation in her lower thoracic and lumbosacral spine, but negative straight leg raising tests. (Tr. at 361-62). She was anxious, but fully oriented. (*Id*.). Dr. Burck diagnosed Claimant with, *inter alia*, right shoulder pain, lumbago, left piriformis syndrome,[2] recurrent major depressive disorder, panic attacks, obsessive compulsive disorder, hand joint pain, fatigue, and hip tendonitis. (Tr. at 362). Dr. Burck prescribed naproxen, a muscle relaxant, and Prozac, and she instructed Claimant to do home exercises twice daily. (*Id*.).

Orthopedic physician, Matthew Wingate, M.D., examined Claimant's right shoulder on December 3, 2015. The previous residual fracture line was no longer evident in her MRI. (Tr. at 351). However, Dr. Wingate assessed that Claimant's shoulder remained stiff and painful due to her failure to participate in physical therapy to improve her range of motion strengthening. (*Id*.).

On December 11, 2015, Claimant saw Dr. Burck for medication follow-up.

---

[2] "Piriformis syndrome is a condition in which the piriformis muscle, located in the buttock region, spasms and causes buttock pain. The piriformis muscle can also irritate the nearby sciatic nerve and cause pain, numbness and tingling along the back of the leg and into the foot (similar to sciatic pain)." https://www.spine-health.com/conditions/sciatica/what-piriformis-syndrome.

Claimant stated that she was still experiencing incontinence and was urinating on herself every day. (Tr. at 406). She was using the overactive bladder medication Oxytrol, which had worked for two weeks, but was no longer effective. (*Id*.). Claimant stated that when she felt the urge to urinate, she would stand up to go to the bathroom, but could not retain urine. (*Id*.). She also urinated when coughing or sneezing. (*Id*.). She was wearing pads to stay dry. (*Id*.). Claimant also complained that she could not stand up or get anything done due to back pain. (*Id*.). The pain originated in her lumbosacral spine and extended into her legs, but she did not have numbness or tingling in her legs. (*Id*.). Claimant stated that she felt relief only when seated, and the problem worsened in the past year, especially because she gained weight. (*Id*.). Dr. Burck found that Claimant had significant lordosis, pain on palpation, and positive straight leg raising tests bilaterally. (Tr. at 409). Her reflexes were normal, and Claimant did not express any complaints related to her shoulder, nor were there any examination findings or diagnoses relating to her shoulder. (Tr. at 409-10).

On May 9, 2016, Claimant told Dr. Burck that it was "hard to get around since falling down steps." (Tr. at 1013). Claimant refused physical therapy because she had "no way to get there." (*Id*.). She complained of diffuse joint pain and muscle aches, as well as anxiety. (Tr. at 1014). However, Claimant demonstrated a normal gait and station, she was oriented in all spheres, and her mood and affect were normal. (Tr. at 1016). Dr. Burck renewed Claimant's prescriptions for naproxen, Prozac, and a muscle relaxer. (Tr. at 1017).

On November 30, 2016, Claimant told Dr. Burck that Prozac was helpful for depression, but she still had significant anxiety and panic attacks on a daily basis. (Tr. at 1024). Claimant said it was a lifelong issue. (*Id*.). Claimant stated that Xanax was

13

helpful in the past, and she would like to try it again, but Dr. Burck wanted Claimant to try other options first. (*Id.*). Claimant still complained of low back pain extending down into the backs of her legs, particularly the left extremity. (*Id.*). However, Claimant related that she finally found a physical therapist that would accept her insurance and she was ready to begin treatment. (*Id.*). Her feet were also persistently numb, but she attributed it to scalding burns that she suffered on her feet years earlier. (*Id.*). Claimant told Dr. Burck that she continued to urinate on herself every day and was staying home more than she would like to stay home out of fear that she would have accidents in public. (Tr. at 1025). She said that Oxytrol was not effective. (*Id.*). On examination, Claimant had normal gait and station, but restricted lumbosacral rotation to the left and piriformis pain on palpation. (Tr. at 1027). She was fully oriented, and her mood and affect were normal. (*Id.*). In fact, Dr. Burck specifically noted that Claimant's mood was good, and Claimant was more animated and comfortable than she had been in a year or more. (*Id.*). Dr. Burck renewed Claimant's medications, added the antidepressant Wellbutrin, and ordered a urine culture. (Tr. at 1028).

On December 29, 2016, Claimant was referred to orthopedic nurse practitioner, Shannon Cox, FNP-BC, for a consultation regarding her low back pain that radiated into her lower extremities and was worse in her left hip. (Tr. at 1039). She denied numbness, tingling, or bladder issues. (*Id.*). Claimant stated that she experienced the pain for three years, and it was worsened by a fall two years earlier. (*Id.*). She claimed that sitting was the only thing that minimized her pain. (*Id.*). She also reported neck pain radiating into her upper extremities with numbness and tingling in her left thumb and wrist. (*Id.*). On examination, Claimant had normal gait, station, and stability; unrestricted range of motion; no upper or lower extremity weakness; and normal deep

tendon reflexes, except that her patella reflex was brisk. (Tr. at 1041). She did not have any clonus or sensory loss, and she had full strength in her extremities. (*Id.*). She had a positive figure-four test for exacerbating pain in her left hip, but her straight leg raising tests were negative. (*Id.*). She had normal judgment, insight, orientation, mood, and affect. (*Id.*). Nurse Cox diagnosed Claimant with lumbago, hip pain, neck pain, and chronic bilateral low back pain with sciatica. (*Id.*). She ordered x-rays and MRIs of Claimant's spine and an x-ray of Claimant's left hip. (Tr. at 1042).

On January 23, 2017, Claimant was referred to urologist, Lawrence Wyner, M.D., for kidney stones, urinary urge incontinence, and flank pain. (Tr. at 1033). Claimant stated that she suffered incontinence several times per day for over a year, as well as urine leakage when coughing or sneezing. (*Id.*). She demonstrated normal gait, station, mood, affect, and orientation in all spheres. (Tr. at 1036). Dr. Wyner diagnosed Claimant with a urinary tract infection and prescribed Ciprofloxacin. (Tr. at 1036-37).

On March 30, 2017, Claimant presented to Suzanne Spooner, ACNP, stating that her radiculopathy pain was becoming intolerable. (Tr. at 1058). Claimant was not in acute distress when sitting, but she stated that she had back pain when walking. (Tr. at 1061). She walked with a normal tandem gait without limping or stumbling, and she could toe walk and heel walk without eliciting any back pain. (*Id.*). She had normal range of motion in her back, except with extension; full strength in her extremities; negative straight leg raising tests; normal sensation, except in her right lower foot area; and she was hyper reflexive in her extremities. (*Id.*). Nurse Spooner ordered a lumbar MRI. (*Id.*). Claimant's left hip x-ray did not reveal any acute abnormality. (Tr. at 1064). Her cervical spine x-ray showed mild degenerative disc disease at C5-6. (Tr. at 1066). On flexion, there was anterior translation of the inferior articular facets of C2 and C4

15

at their respective facet joints. (*Id.*). Finally, Claimant's lumbar spine x-ray revealed no instability, fracture, or subluxation, and her disc space heights appeared relatively preserved. (Tr. at 1068).

On April 3, 2017, Claimant presented for follow up with Dr. Wyner regarding her bladder issues. She displayed normal orientation, mood, and affect. (Tr. at 1056). Dr. Wyner diagnosed Claimant with chronic cystitis, ordered testing, and prescribed Macrobid. (Tr. at 1057). Claimant's lumbar spine MRI was taken on May 5, 2017. It showed degenerative disc disease at T11-12. (Tr. at 1050). There were also posterior element degenerative changes producing moderate focal canal stenosis at L4-5. (*Id.*). However, there was no disc herniation. (*Id.*).

On June 27, 2017, Claimant told Dr. Burck that naproxen was no longer alleviating her bilateral hip pain, and she preferred 800 milligram ibuprofen tablets, but they caused constipation. (Tr. at 1135). Claimant denied psychiatric complaints, and she demonstrated normal judgment, insight, orientation, memory, mood and affect on examination. (Tr. at 1136, 1138). Her gait and station were likewise normal. (Tr. at 1138). Dr. Burck diagnosed Claimant with piriformis syndrome and hip pain. (Tr. at 1139). She administered a trigger point Kenalog injection and prescribed Celebrex. (*Id.*).

On June 28, 2017, Claimant saw Dr. Wyner for follow up regarding her recurrent urinary tract infections. (Tr. at 1206). She complained of back pain, but no diffuse joint pain, muscle aches, joint swelling or stiffness, spasm of back muscles, limping, neck pain or spasms, or psychiatric complaints. (*Id.*). Dr. Wyner ordered a urine culture and prescribed an antibiotic. (Tr. at 1209).

On August 3, 2017, Claimant presented to neurosurgical nurse practitioner,

Ciara Floyd, FNP-BC, in consultation with neurosurgeon, Anthony Alberico, M.D. She stated that she suffered low back pain that radiated down her legs to her knees and sometimes had numbness in her feet. (Tr. at 1191). Claimant expressed that the pain began in 2012 or 2013, and she stated that she was receiving chiropractic treatment, but nothing helped. (*Id.*). On examination, Claimant was in no acute distress with normal stability, muscle strength, muscle tone, and reflexes, and no sensory loss. (Tr. at 1193). Dr. Alberico reviewed Claimant's MRI and concluded that it did not meet the threshold for surgical intervention. (*Id.*). Claimant had some facet arthropathy, particularly, at L4-5, but nothing that warranted surgery. (Tr. at 1194). The providers referred Claimant to pain management. (Tr. at 1193).

On August 17, 2017, Claimant told Dr. Burck that the steroid injections were not effective. (Tr. at 1184). Claimant denied psychiatric complaints and demonstrated normal judgment, insight, orientation, memory, mood and affect. (Tr. at 1184, 1187). Dr. Burck increased Claimant's dosage of Celebrex. (Tr. at 1188).

On September 26, 2017, Dr. Wyner signed a medical form to authorize an incontinence garment for Claimant due to what he described as "functional urinary incontinence." (Tr. at 1396). On October 4, 2017, Dr. Wyner ordered tests to assess for bladder dysfunction and prescribed antibiotics. (Tr. at 1180). Claimant's gait, station, orientation, mood, and affect remained normal. (Tr. at 1179). On October 19, 2017, Dr. Wyner performed a urodynamic evaluation due to Claimant's urinary tract infections over the past 18 months and her reported urgency and frequency. (Tr. at 1151). He diagnosed Claimant with a urinary tract infection and small bladder capacity. (*Id.*).

On November 6, 2017, x-rays were taken of Claimant's hips due to her pain complaints, but the x-rays showed no acute bony abnormality. (Tr. at 1287). An x-ray

of Claimant's lumbar spine on the same date showed no acute bony abnormality, subluxation, or instability on flexion or extension; minimal anterior osteophytes; and her vertebral body heights were maintained. (*Id.*).

On November 9, 2017, Claimant presented to Ghassan Moufarrege, M.D., for pain management. (Tr. at 1317). On examination, Claimant had a non-antalgic gait, grossly intact neurological functioning, stable behavioral patterns, and relevant and coherent speech with average rate of fluency. (Tr. at 1324). However, she demonstrated restricted lumbar range of motion and tenderness to palpation. (*Id.*). Claimant had unrestricted movement in her lower extremities, full muscle strength, no sensory deficits, normal deep tendon reflexes, and negative Faber and straight leg raising tests. (Tr. at 1325). Dr. Moufarrege diagnosed Claimant with lumbar spondylosis, sacroiliac joint dysfunction, and myofascial pain syndrome. (*Id.*). He recommended a lumbar facet nerve block. (*Id.*).

Claimant followed up with Dr. Wyner on November 13, 2017. She denied any increase in frequency or urgency and was doing well. (Tr. at 1349). Dr. Wyner scheduled Claimant to follow up in six months. (Tr. at 1354). Claimant saw Dr. Burck on November 16, 2017. She denied psychiatric complaints and had normal gait, station, judgment, insight, orientation, memory, mood, and affect. (Tr. at 1332, 1335). Regarding her musculoskeletal complaints, Dr. Burck diagnosed Claimant with sacroiliac joint dysfunction. (Tr. at 1335).

### *B. Evaluations and Opinions*

On December 2, 2015, Kip Beard, M.D., performed an Internal Medicine Examination ("IME") of Claimant. Claimant denied any urinary urgency, frequency, dysuria, or hesitancy. (Tr. at 495). She presented without ambulatory aids, but wore

assistive devices, which Dr. Beard stated were unnecessary. (*Id*.). Her gait was slow, but it was not limping or unsteady. (*Id*.). She could stand unassisted, rise from her seat, and step up and down from the examination table without obvious difficulty. (*Id*.). She seemed comfortable seated, but reported some discomfort lying on her back. (*Id*.). She could abduct and forward flex her shoulder to 90 degrees, and internally rotate to 60 degrees, stating that it was far as she could go. (Tr. at 496). She expressed some tenderness, but her pain reaction in her right shoulder was mild and there was no redness, warmth, or swelling. (*Id*.). Her lumbosacral spine revealed normal appearing curvatures; mild pain reaction on range of motion testing; and small paravertebral tenderness, but no spasm. (*Id*.). She could forward bend to 70 degrees with normal motion otherwise; stand on one leg alone; raise her legs to 90 degrees while seated with no complaints; raise her legs to 60 degrees while lying on her back with some discomfort, but no radicular complaints; and flex her hips to 90 degrees with normal range of motion otherwise. (*Id*.). She had some back and hip pain with range of motion testing of her hips. (*Id*.). She had some weakness in her right shoulder of four on a five-point scale, but she only exhibited fair effort, and there was no atrophy or sensory loss. (*Id*.). Dr. Beard diagnosed Claimant with history of right greater tuberosity fracture that was healed; chronic right shoulder pain that was possibly posttraumatic osteoarthritis; generalized arthralgias; and possible asthma/COPD per history. (Tr. at 497).

On December 7, 2015, consulting psychologist, Cherie Zeigler, M.A., performed a Mental Status Examination ("MSE") of Claimant. Claimant appeared disheveled, apathetic, nervous, and anxious with slow speech and poor judgment and insight, but she was fully oriented, and her thought content was relevant on redirection. (Tr. at

510). Ms. Zeigler assessed that Claimant's social functioning was mildly deficient based on her interaction during the examination. (*Id*.). Ms. Zeigler diagnosed Claimant with moderate unspecified major depressive disorder with anxious features based upon her clinical observation and Claimant's reported symptoms and treatment for depression. (Tr. at 511).

On January 6, 2016, Rogelio Lim, M.D., assessed Claimant's physical RFC based upon his review of her records. He concluded that Claimant could perform work at the medium exertional level with occasional climbing of ladders/ropes/scaffolds and no concentrated exposure to temperature extremes, wetness, humidity, vibration, fumes, or hazards. (Tr. at 82-83). In support of his evaluation, Dr. Lim cited Claimant's asthma, pyriformis syndrome, lordosis, and back pain, but he noted that Claimant did not have any neurological deficits, and, although she walked slow during her consultative examination, she did not use ambulatory aids. (Tr. at 83). He found that the medical evidence of record did not fully support her physical allegations. (Tr. at 81).

On January 7, 2016, psychiatrist, James Binder, M.D., performed a Psychiatric Review Technique (PRT) based on his review of Claimant's records. He assessed Claimant had mild restriction in activities of daily living and social functioning and moderate restriction in maintaining concentration, persistence, or pace.[3] (Tr. at 80). He explained that Claimant had a history of abusive relationships and depression; she had deficits in concentration, persistence, or pace in her consultative examination; and

---

[3] The mental functional categories were amended following Dr. Binder's assessment. The current categories include: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(a) (effective Mar. 27, 2017).

she had mental health treatment in the past. (*Id.*). However, Dr. Binder found that Claimant's allegations of impaired understanding were not fully supported by the medical evidence of record. (Tr. at 81). In assessing Claimant's mental RFC, Dr. Binder concluded that Claimant was moderately limited in understanding, remembering, and carrying out detailed instructions; maintaining attention and concentration for extended periods; completing a normal workday and workweek without interruptions from psychologically based symptoms; interacting appropriately with the general public; and maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness based on her disheveled appearance at her consultative examination. (Tr. at 84-85). Nevertheless, Dr. Binder affirmed that Claimant was capable of learning and performing basic work-like tasks. (Tr. at 85).

Timothy Saar, Ph.D., affirmed Dr. Binder's PRT and mental RFC assessment on April 28, 2016. (Tr. at 108, 113-14). However, regarding Claimant's physical RFC, Narendra Parikshak, M.D., found that Claimant was only capable of light work due to her right shoulder injury and range of motion limitations. (Tr. at 110). Dr. Parikshak agreed with Dr. Lim that Claimant could occasionally climb ladders/ropes/scaffolds, but she concluded that Claimant could only frequently climb ramps/stairs, balance, stoop, crouch, or crawl due to her degenerative disc disease of the lumbar spine, back pain with some range of motion limitations, and her body mass index of 41. (Tr. at 111). In addition, Dr. Parikshak assessed that Claimant could occasionally reach overhead with her right arm. (*Id.*). She agreed with Dr. Lim that Claimant's environmental limitations included no concentrated exposure to temperature extremes, wetness, humidity, vibration, fumes, or hazards. (Tr. at 112).

### C. Claimant's Statements

Claimant testified during her administrative hearing on December 15, 2017 that she could not work due to issues with her back, hips, arms, and her "whole body." (Tr. at 36). She stated that her back pain radiated into her lower extremities, especially on the left side. (Tr. at 37). She claimed that the pain prevented her from doing "everything," and she could not even stand to do dishes at the sink. (*Id.*). Claimant said that her right shoulder still hurt because it never healed correctly, and she had problems lifting her arm above her head. (Tr. at 38-39, 48). She also reportedly had "nerve damage" all over her body. (Tr. at 39). Claimant testified that she could not write for very long because her hand started cramping; she could not really lift; and she could not stand or sit for very long. (*Id.*). She stated that she suffered from depression and anxiety her whole life; she was on medication intermittently, but was consistently on it for the past four years; and she did not go anywhere other than doctor appointments. (Tr. at 41-42). Her driver's license was suspended 20 years earlier after she drove under the influence, and she never sought to have it reinstated. (Tr. at 43). She spent her days watching television, visiting with people at her house, and "piddling around." (*Id.*). Her sister did her grocery shopping, and Claimant prepared simple meals, mostly using the microwave. (Tr. at 44). Claimant testified that she had frequent urinary tract infections for the past 18 months and suffered incontinence two or three times per day, which required her to change her clothes. (Tr. at 46). She explained that the incontinence was believed to be caused by urinary tract infections. (Tr. at 51). Claimant stated that she did laundry approximately once per week, could lift a gallon of milk, and did not use a cane. (Tr. at 47-48). However, she claimed to have trouble concentrating and thinking through things. (Tr. at 50). She thought she had "brain damage." (*Id.*).

## VI.    <u>Standard of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the record and determine whether it is adequate to support the conclusion of the Commissioner. *Hays*, 907 F.2d at 1456. When conducting this review, the Court does not re-weigh evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001) (citing *Hays*, 907 F.2d at 1456)). Moreover, "[t]he fact that the record as a whole might support an inconsistent conclusion is immaterial, for the language of § 205(g) ... requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" *Blalock*, 483 F.2d at 775 (citations omitted). Thus, the relevant question for the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig*, 76 F.3d at 589).

## VII.  **Discussion**

Claimant argues that the ALJ should have assessed more restrictive RFC limitations and accepted the VE's opinion that there were no jobs available for someone who had such limitations. Her arguments are considered below, in turn.

### *A. RFC*

SSR 96-8p provides guidance on how to properly assess a claimant's RFC, which is the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1. RFC is a measurement of the ***most*** that a claimant can do despite his or her limitations resulting from both severe and non-severe impairments, and the finding is used at steps four and five of the sequential evaluation to determine whether a claimant can still do past relevant work and, if not, whether there is other work that the claimant is capable of performing. *Id*. According to the Ruling, the ALJ's RFC determination requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id*. at *3.

Only by examining specific functional abilities can the ALJ determine (1) whether a claimant can perform past relevant work as it was actually, or is generally, performed; (2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is capable of doing the full range of work contemplated by the exertional level." *Id*.  Indeed, "[w]ithout a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." *Id*. at *4. In

24

determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at *7. Further, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* at *7.

While an ALJ is not required to explicitly discuss "irrelevant or uncontested" functions, "[r]emand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)) (markings omitted).

### 1. Anxiety

Claimant first alleges that the ALJ should have assessed that she could only occasionally interact with the public due to her anxiety. At step two of the sequential evaluation, the ALJ found that Claimant's depression and anxiety were severe impairments. (Tr. at 14). The ALJ applied the special technique to assess the functional impact of Claimant's mental impairments. (Tr. at 17). As most relevant to this matter, the ALJ found that Claimant was only mildly limited in the area of interacting with others. (*Id.*). The ALJ cited Claimant's function reports, hearing testimony, and treatment notes, concluding that Claimant maintained social interactions without excessive irritability, sensitivity, argumentativeness, or suspiciousness; responded appropriately to requests, suggestions, criticism, corrections, and challenges; was capable of cooperating with others and asking for help when needed; and easily established rapport with medical staff, interacted appropriately, and maintained eye

25

contact. (*Id*.).

In assessing Claimant's RFC, the ALJ acknowledged Claimant's statements that she suffered from depression and anxiety her whole life, was on-and-off medication, avoided crowds, and only left home to go to medical appointments. (Tr. at 20). The ALJ concluded that Claimant was treated for depression and anxiety for many years, and her symptoms waxed and waned in severity in response to temporary life stressors. (Tr. at 21). The ALJ noted that Claimant's symptoms improved after taking minor doses of routine medications, and her symptoms remained generally mild for years. (*Id*.). The ALJ additionally remarked that Claimant was not consistent in taking her medication, but, when she adhered to her medication regimen, she reported significant improvement in her symptoms, such as reduction in the frequency and severity of panic attacks and fewer obsessive thoughts. (*Id*.). The ALJ noted that Claimant never reported hallucinations, delusions, or thoughts of self-harm, nor did she ever require emergency medical care or inpatient hospitalization for uncontrolled symptoms. (*Id*.). Ultimately, the ALJ found that such factors indicated that Claimant's symptoms were relatively minor and well controlled when she was compliant with her medication regimen and treatment recommendations. (*Id*.). The ALJ found many inconsistencies between the objective evidence and Claimant's allegations of totally disabling symptoms. (*Id*.). The ALJ noted that, although Claimant has received treatment for her impairments, the treatment was essentially conservative and routine with relatively infrequent trips to the doctor and significant gaps in treatment history. (*Id*.). The ALJ found that the treatment that Claimant received was generally successful in controlling her symptoms. (*Id*.).

The ALJ also considered the opinion evidence regarding Claimant's mental

functional abilities and afforded the opinions great weight. (Tr. at 21-22). The ALJ noted that the consultative psychologist found that Claimant's social functioning was only mildly impaired. (Tr. at 22).

The ALJ's above analysis is supported by substantial evidence. In 2007, Claimant was evaluated at Prestera Center. (Tr. at 483). She related a history of abusive relationships. (*Id.*). During the evaluation, she was calm, cooperative, coherent, and fully oriented. (*Id.*). She was diagnosed with major depressive disorder and prescribed Cymbalta and Vistaril. (Tr. at 484). After a lengthy gap in treatment, purportedly due to lack of medical insurance, Claimant related to her primary care provider, Dr. Burck, in April 2014 that her nerves were "bad," and Dr. Burck prescribed Prozac. (Tr. at 424-25, 428). In July 2015, Claimant told Dr. Burck that she would not go physical therapy because she would not go in public. (Tr. at 359). She stated that Prozac helped her a lot, but she continued to have panic attacks. (*Id.*). However, the following year, in May 2016, Claimant told Dr. Burck that she refused physical therapy because she had "no way to get there." (Tr. at 1013). In November 2016, Claimant advised Dr. Burck that Prozac was effective for her depression, but she had daily panic attacks. (Tr. at 1024). She said it was a lifelong issue. (*Id.*). However, Dr. Burck noted that Claimant was fully oriented with a normal mood and affect. (Tr. at 1027). In fact, Claimant's mood was "good" and Dr. Burck recorded that Claimant was more animated and comfortable than she had been in a year or more. (*Id.*). Claimant was continued on medications, and Wellbutrin was added to her medication regimen. (Tr. at 1028). Other providers, including Nurse Cox in December 2016 and Dr. Wyner in January and April 2017, noted Claimant's normal mood, affect, and orientation. (Tr. at 1036, 1041, 1056). In June, August, and November 2017, Claimant denied any psychiatric complaints, and

her mental status and behavior were normal. (Tr. at 1184, 1187, 1206, 1324, 1332, 1335).

In addition, Claimant had a consultative psychological examination in December 2015 performed by Ms. Zeigler, who found Claimant's social functioning to be only mildly deficient. (Tr. at 510). In January 2016, Dr. Binder reviewed Claimant's records and agreed that Claimant was only mildly limited in the functional domain of social interaction. (Tr. at 80). Dr. Binder noted Claimant's moderate limitation in interacting with the general public and maintaining socially appropriate behavior and grooming standards based on her disheveled appearance at the consultative examination. (Tr. at 84-85). However, he concluded that Claimant could learn and perform basic work-like tasks, and he did not assess any social restrictions. (Tr. at 85). Dr. Saar affirmed Dr. Binder's assessment in April 2016. (Tr. at 108, 113-14). Moreover, Claimant testified in December 2017 that her daily activities included visiting with people at her home. (Tr. at 43). She cited physical issues as the reason that she could not work. (Tr. at 37).

Overall, the record substantially supports the ALJ's assessment that no additional mental restrictions were warranted in Claimant's RFC. As shown above, Claimant was treated conservatively by her primary care physician. She maintained routine scheduled appointments with her medical providers during which she interacted normally. She affirmed that medication was effective, and, as of 2017, Claimant denied psychiatric issues to her medical providers. The record does not reflect specialized mental health treatment, counseling, in-patient treatment, or any significant exacerbation of Claimant's symptoms. Finally, none of the several experts that reviewed Claimant's medical evidence assessed that Claimant could only occasionally interact with the general public.

The ALJ considered all of the relevant evidence and articulated a thorough, well-reasoned analysis that is supported by the evidence in the record. Claimant argues that the ALJ should have found Claimant to be capable of only occasionally interacting with the public, but fails to offer any basis for such conclusion. She does not point to any evidence that the ALJ overlooked or any flaws in her analysis. The role of the court in reviewing an agency's decision is not to conduct independent fact finding or weighing of evidence. Specifically, it is not the duty of the court to analyze the record *de novo* and determine whether a claimant is disabled. *Johnson*, 434 F.3d at 653. Rather, the court simply reviews the record to determine if the Commissioner's decision of nondisability is supported by substantial evidence. *Id.* The court must uphold the ALJ's decision if it is supported by more than a mere scintilla of evidence. *Blalock*, 483 F.2d at 776. While Claimant may disagree with the ALJ's RFC finding, "the determination of a claimant's RFC is ultimately the province of the ALJ as the representative of the Commissioner." *McPherson v. Astrue*, 605 F. Supp. 2d 744, 755 (S.D.W. Va. 2009) (citing 20 C.F.R. § 404.1527(e)(2); *see also Hays,* 907 F.2d at 1456. "The reviewing court's sole responsibility is to determine whether the ALJ's determination of the claimant's RFC is rational and based on substantial evidence." *Id.* (citing *Oppenheim v. Finch,* 495 F.2d 396, 397 (4th Cir.1974). That standard is very clearly met, even exceeded, in this case. For all of the above reasons, the undersigned **FINDS** that the ALJ's RFC analysis of Claimant's anxiety complied with the law and was supported by substantial evidence.

### 2. Right Shoulder Impairment

Claimant further argues that the ALJ should have assessed that she could only occasionally reach in front due to her right shoulder impairment. In assessing

Claimant's RFC, the ALJ discussed that Claimant fractured her right shoulder due to a fall. The ALJ explained that, although the fracture healed within a short period, follow-up treatment notes indicated that Claimant continued to experience residual effects of the injury, including reduced range of motion in the shoulder joint due to pain and stiffness. (Tr. at 20). The ALJ noted that Claimant participated in physical therapy, but failed to fully recover from her injury, leading to a diagnosis of "frozen shoulder," which made it difficult for her to raise her right arm above shoulder level. (*Id.*). The ALJ cited Dr. Beard's consultative examination report, including Dr. Beard's finding that Claimant suffered mild range of motion loss in her right shoulder. (Tr. at 22). The ALJ gave Dr. Beard's report and Dr. Parikshak's RFC opinion great weight. (Tr. at 21-22). Consistent with such evidence, the ALJ assessed that Claimant could only occasionally reach overhead with her right upper extremity. (Tr. at 19).

Reviewing the transcript of proceedings, the record indeed reflects that Claimant suffered residual stiffness and restriction in reaching overhead with her right arm, but it amply supports the ALJ's conclusion that no additional RFC restrictions were warranted. For instance, Dr. Beard found in December 2015 that Claimant could forward flex her shoulder to 90 degrees. (Tr. at 496). He noted that her pain reaction in her right shoulder was mild and there was no redness, warmth, or swelling. (*Id.*). She had mildly reduced muscle strength of 4 on a 5-point scale, but she only exhibited fair effort, and there was no muscle atrophy or sensory loss. (*Id.*). Moreover, Dr. Parikshak concluded in April 2016, based upon her review of Claimant's records, that Claimant could perform light work with only occasional overhead reaching with her right arm. (Tr. at 111).

Again, Claimant does not point to any critical evidence that the ALJ overlooked

or any flaws in her RFC analysis. The ALJ specifically considered Claimant's functional ability to reach with her right arm and articulated a reasoned RFC assessment based on the evidence in the record. Claimant does not identify any basis for her suggested RFC restriction that limited her to occasional front reaching with her right upper extremity. No expert adduced such a limitation, and Claimant's own testimony primarily focused on her difficulty reaching overhead, a restriction which the ALJ included in the RFC assessment. (Tr. at 39). There is much more than a scintilla of evidence to support the ALJ's findings. Therefore, the undersigned **FINDS** that the ALJ's RFC analysis of Claimant's right shoulder impairment complied with the law and was supported by substantial evidence.

### 3. Incontinence

Claimant next asserts that the ALJ should have assessed that she would be off-task for 10 percent of the workday due to incontinence. At step two of the sequential evaluation, the ALJ discussed Claimant's incontinence. She noted that Claimant recently received medical treatment for bladder issues with incontinence and took medications for incontinence and sometimes wore pads. (Tr. at 15). However, the ALJ found that the condition did not cause physical or mental limitations in performing vocational activities. (*Id.*). Thus, the ALJ found that the impairment was non-severe. (*Id.*). As noted, the ALJ assessed Claimant's mental functional abilities, including her moderate limitation in maintaining concentration, persistence, or pace. (Tr. at 17). The ALJ remarked upon Claimant's ability to sustain an ordinary routine and regular attendance at medical appointments where she interacted appropriately, as well as other evidence indicating her ability to remain on task despite her physical and mental impairments. (*Id.*).

The ALJ's conclusion that Claimant's incontinence did not impose any functional limitations is supported by the record. Claimant related to Dr. Burck in July 2015 that she suffered incontinence that was not painful, but she described it as a sense of urgency and leakage of urine when she coughed or sneezed. (Tr. at 359). However, during her consultative examination in December 2015, Claimant denied any urinary urgency or frequency. (Tr. at 495). Nevertheless, Claimant continued to report incontinence to Dr. Burck, and Dr. Burck referred Claimant to urologist, Dr. Wyner, in January 2017. (Tr. at 406, 1024-25, 1033). Dr. Wyner determined that Claimant suffered from recurrent urinary tract infections and he prescribed antibiotics. (Tr. at 1151, 1176, 1180, 1206). He described Claimant's condition as "functional urinary incontinence" on a form that he signed in September 2017 to order an incontinence garment for Claimant. (Tr. at 1396). Claimant testified in December 2017 that her incontinence appeared to be caused by urinary tract infections. (Tr. at 51). However, she did not identify incontinence as a reason that she could not work. (Tr. at 37).

Importantly, none of the experts who examined or reviewed Claimant's records assessed any limitations related to Claimant's incontinence. Dr. Beard did not discuss the issue in his 2015 consultative examination report, nor did he ascribe any diagnosis related to bladder issues. (Tr. at 497). Neither Dr. Lim nor Dr. Parikshak, who reviewed Claimant's medical records in 2016, assessed an off-task RFC limitation. (Tr. at 82-83, 111-12). For that matter, neither physician noted any RFC limitations related to incontinence.

The ALJ found that the record revealed multiple inconsistences between the objective evidence and Claimant's subjective allegations of totally disabling symptoms. (Tr. at 21). Claimant claimed in her administrative hearing that she had to change her

clothes two or three times per day due to incontinence. (Tr. at 46). However, she previously advised Dr. Burck that she was wearing pads to stay dry, and Dr. Wyner authorized an incontinence undergarment, which would appear to support the ALJ's finding that Claimant's subjective symptoms were not fully credible. (Tr. at 406, 1396). As discussed, it is not the role of the Court to weigh Claimant's credibility. The ALJ fulfilled her duty in examining Claimant's allegations and weighing the other evidence in the record, including the fact that no physician opined that Claimant would be off-task during the workday due to her impairments. For those reasons, the undersigned **FINDS** that the ALJ's RFC analysis of Claimant's incontinence complied with the law and was supported by substantial evidence.

### 4. Back and joint pain

Finally, Claimant argues that the ALJ should have imposed the RFC restriction that she needed to alternate between sitting and standing every 15 minutes. The ALJ found at step two of the sequential evaluation that Claimant's obesity and degenerative disc disease with hip pain were severe impairments. (Tr. at 14). In assessing her RFC, the ALJ considered Claimant's allegations of spine and joint pain, but noted that the record showed only minor and sporadic treatment. (Tr. at 20). The ALJ cited that Claimant's physical examinations showed some painful and reduced range of motion in her low back and left hip with tenderness to palpation and occasional muscle spasm. (*Id*.). However, her diagnostic studies consistently showed only minimal degenerative changes in her spine. (*Id*.). Further, the ALJ noted that Claimant walked with a slow, but normal, gait and station without requiring an assistive device to stand and walk for long periods of time. (*Id*.). The ALJ remarked that during the consultative examination, Claimant was able to climb on and off of the examination table without

difficulty and move between seated and standing positions. (*Id.*). Moreover, the ALJ cited that Claimant's records demonstrated negative straight leg raising tests, minimal disc bulging, and no significant nerve root impingement. (*Id.*). The ALJ considered that Claimant's physicians provided pain management with medications and periodic injections, but they did not recommend surgery or any other significant course of treatment, which would suggest relatively minor symptomology. (*Id.*). Overall, the ALJ found that the record did not show any findings to suggest that Claimant could not stand or walk for long periods. (*Id.*).

The ALJ also considered Claimant's obesity in assessing her RFC, noting that it was expected to exacerbate the symptoms of her medical conditions, such as increasing the strain and pressure on her spine and joints, and it also caused fatigue. (Tr. at 21). However, the ALJ gave great weight to Dr. Beard's examination report and Dr. Parikshak's opinion of Claimant's RFC, neither of which included a sit-stand restriction. (Tr. at 21-22).

The ALJ's above analysis is consistent with the evidence of record. Claimant presented to her December 2015 consultative examination without ambulatory aids, but wearing assistive devices, which Dr. Beard stated were unnecessary. (Tr. at 495). Her gait was slow, but she was not limping or unsteady. (*Id.*). She could stand unassisted, rise from her seat, and step up and down from the examination table without obvious difficulty. (*Id.*). She seemed comfortable seated, but reported some discomfort lying on her back. (*Id.*). Her lumbosacral spine revealed normal appearing curvatures; mild pain reaction on range of motion testing; and small paravertebral tenderness, but no spasm. (Tr. at 496). She could forward bend to 70 degrees with normal motion otherwise; stand on one leg alone; raise her legs to 90 degrees while

34

seated with no complaints; raise her legs to 60 degrees while lying on her back with some discomfort, but no radicular complaints; and flex her hips to 90 degrees with normal range of motion otherwise. (*Id.*). She had some back and hip pain with range of motion testing of her hips. (*Id.*). Dr. Beard diagnosed Claimant with generalized arthralgias. (Tr. at 497).

During a subsequent examination on March 2017, Claimant was in no real acute distress sitting. (Tr. at 1061). She stated that she had back pain when walking, but she walked with a normal tandem gait without limping or stumbling, and she could toe walk and heel walk without eliciting any back pain. (*Id.*). She had normal range of motion in her back except with extension, full strength in her extremities, negative straight leg raising test, normal sensation except in her right lower foot area, but she was hyper reflexive in her extremities. (*Id.*). Claimant's left hip x-ray did not reveal any acute abnormality. (Tr. at 1064). Her cervical spine x-ray showed mild degenerative disc disease at C5-6. (Tr. at 1066). Her lumbar spine x-ray showed no instability, fracture, or subluxation, and her disc space heights appeared relatively preserved. (Tr. at 1068).

Claimant's lumbar MRI in May 2017 reflected degenerative disc disease at T11-12. (Tr. at 1050). There were also posterior element degenerative changes producing moderate focal canal stenosis at L4-5. (*Id.*). However, there was no disc herniation. (*Id.*). In August 2017, during a neurosurgical examination, Claimant was in no acute distress with normal stability, muscle strength, muscle tone, and reflexes, and no sensory loss. (Tr. at 1193). There were no findings that warranted surgical intervention, and Claimant was referred to pain management. (*Id.*).

Later, x-rays of Claimant's hips in November 2017 showed no acute bony abnormality. (Tr. at 1287). An x-ray of her lumbar spine showed no acute bony abnormality or subluxation, instability on flexion or extension, minimal anterior osteophytes, and her vertebral body heights were maintained. (*Id.*). Claimant's pain management records that month reflected her non-antalgic gait and grossly intact neurological functioning. (Tr. at 1324). Claimant had restricted lumbar range of motion and tenderness to palpation, but unrestricted movement in lower extremities, full muscle strength, no sensory deficits, normal deep tendon reflexes, and negative Faber and straight leg raising tests. (Tr. at 1324-25). Her diagnoses included lumbar spondylosis, sacroiliac joint dysfunction, and myofascial pain syndrome. (*Id.*). Yet, despite this evidence, Claimant testified the following month, in December 2017, that pain prevented her from doing "everything," and she could not even stand at the sink to do dishes, and she could not sit or stand for very long. (Tr. at 37, 39).

Based on the above, the ALJ very clearly considered the relevant evidence, and the ALJ's analysis of Claimant's ability to sit and stand is supported by substantial evidence from the record, including the expert opinions offered in this matter. Furthermore, the ALJ's analysis that Claimant's subjective symptoms were not fully consistent with the evidence is supported by the clinical records, testing, and expert opinions. Therefore, the undersigned **FINDS** that the ALJ's RFC analysis of Claimant's ability to sit and stand complied with the law and was supported by substantial evidence.

### B. VE Testimony

Claimant contends that the ALJ should have concluded that she was disabled at step five of the sequential evaluation based on the VE's testimony that there were no

36

jobs in the national economy for a person with Claimant's characteristics and RFC who could only occasionally interact with the public, occasionally reach in front, was off-task 10 percent of the workday, and required the option to change positions between sitting and standing every 15 minutes.

In order for a vocational expert's opinion to be relevant, it must be in response to a proper hypothetical question that sets forth all of the claimant's impairments. *English v. Shalala*, 10 F.3d 1080, 1085 (4th Cir. 1993); *Walker v. Bowen*, 889 F.2d 47, 50-51 (4th Cir. 1989). To frame a proper hypothetical question, the ALJ must first translate the claimant's physical and mental impairments into an RFC that is supported by the evidence; one which adequately reflects the limitations imposed by the claimant's impairments. *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006). "[I]t is the claimant's functional capacity, not his clinical impairments, that the ALJ must relate to the vocational expert." *Fisher v. Barnhart,* 181 F. App'x 359, 364 (4th Cir. 2006). A hypothetical question will be "unimpeachable if it adequately reflects a residual functional capacity for which the ALJ had sufficient evidence." *Id.* (citing *Johnson v. Barnhart,* 434 F.3d 650, 659 (4th Cir. 2005)) (internal quotation marks omitted); *see also Russell v. Barnhart*, 58 F. App'x 25, 30 (4th Cir. 2003) (noting that hypothetical question "need only reflect those impairments supported by the record"). However, "[t]he Commissioner can show that the claimant is not disabled only if the vocational expert's testimony that jobs exist in the national economy is in response to questions from the ALJ that accurately reflect the claimant's work-related abilities." *Morgan v. Barnhart*, 142 F. App'x 716, 720-21 (4th Cir. 2005).

In this matter, the ALJ posed a series of hypothetical questions to the VE at Claimant's administrative hearing. First, the ALJ questioned whether there were any

jobs that could be performed by someone with Claimant's characteristics and RFC, and the VE responded that the person could work as a cashier, sorter, or non-postal mail clerk. (Tr. at 53-54). The ALJ next added the limitation that the person could only occasionally interact with the general public. (Tr. at 54). The VE responded that the limitation would eliminate the cashier position, but the person could still work as a sorter or non-postal mail clerk. (*Id*.). The ALJ then added to the hypothetical that the person could occasionally reach in front with the right upper extremity. (*Id*.). The VE responded that it would reduce the number of available sorter and mail clerk positions by 50 percent, but it would not preclude employment, so long as the person still had functional use of the non-dominant hand.[4] (Tr. at 55). The ALJ next added to the hypothetical that the person would be off-task 10 percent of the time, and the VE responded that only 10 percent of the previously-identified jobs would remain. (Tr. at 55-56). The VE stated that if the person was off-task 15 percent of the time, it would preclude all employment. (Tr. at 56). Claimant's attorney asked the VE if the hypothetical claimant could perform light work if the person had to alternate between sitting and standing every 15 minutes, and the VE responded that such limitation would also preclude employment. (Tr. at 57).

Claimant indicates that the ALJ should have accepted this testimony and concluded that she was disabled. However, for the reasons stated, Claimant does not demonstrate that any of those restrictions was warranted. The ALJ properly assessed Claimant's RFC and found that the evidence did not show that Claimant could only occasionally interact with the public, occasionally reach in front with her right upper

---

[4] In this case, Claimant is left-handed. Thus, her RFC actually provided for full use of her dominant left upper extremity, and the occasional reaching limitation concerned her non-dominant arm.

extremity, would be off-task during the workday, or would need to alternate between sitting and standing every 15 minutes. Therefore, there was no justification for the ALJ to rely on the VE's responses to the hypothetical questions that included those limitations. Accordingly, the undersigned **FINDS** that the ALJ properly relied on the VE's testimony at step five of the sequential evaluation.

## VIII.  Recommendations for Disposition

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF Nos. 15, 16); **GRANT** the Commissioner's request for judgment on the pleadings, (ECF No. 19); **AFFIRM** the decision of the Commissioner; **DISMISS** this action, with prejudice, and remove it from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of

*de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Thomas v. Arn*, 474 U.S. 140 (1985); *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED**: April 3, 2020

Cheryl A. Eifert
United States Magistrate Judge